(28 App. Div. 555.)

### GLEASON v. DALTON et al.

(Supreme Court, Appellate Division, Second Department. April 26, 1898.)

1. MUNICIPAL CORPORATIONS—CONTRACTS—SEALED BIDS.

    Statutes requiring that contracts for municipal supplies must be founded on sealed bids, after public advertisement, do not apply where the subject-matter of the contract is such that competitive proposals work an incongruity, and are unavailing as affecting the final result, or where they do not produce any advantage, but the nature of the supply requires that it be determined from inspection and test, which are made up from present examination and trial, and depend upon special knowledge and judgment, or where the thing to be obtained is a monopoly, or the requirement is of personal skill or professional service, or it is practically impossible to observe the statutory form and obtain what is required.

2. SAME—COMPETITIVE BIDS—FURNISHING WATER.

    Section 419 of the "Greater New York Charter," requiring competitive bids for supplies, has no application to contracts for furnishing water to the municipality of New York.

    Goodrich, P. J., dissenting.

Appeal from special term, Kings county.

Action by Patrick J. Gleason against William Dalton, as commissioner of the water supply of the city of New York, and the Citizens' Water-Supply Company of Newtown. From an order granting a peremptory injunction (50 N. Y. Supp. 90), defendants appeal. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Almet F. Jenks, for appellant Dalton.

Sheehan & Collin, for appellant Citizens' Water Supply Co.

F. H. Van Vechten, for respondent.

HATCH, J.   The injunction granted in this action restrained the defendant Dalton, as commissioner of the water supply of the city of New York, from entering into a contract with the defendant the Citizens' Water-Supply Company of Newtown for the supply of water to the borough of Queens, in the city of New York, unless proposals for the supply of water to such locality shall first have been invited by public advertisement, as provided by section 419 of the charter of the city of New York, known as the "Greater New York Charter." It is admitted that no advertisement for bids containing proposals for such water supply has been made, and is not intended to be made; that the commissioner of water supply and the board of public improvements propose to approve of a contract in general terms the same as appears in record, subject, however, to such modifications as may be suggested by the board. These modifications, however, will not affect the price to be paid, the quantity of water to be furnished, or the length of time the contract is to run.   The theory of the complaint is that the proposed contract is unauthorized by reason of the failure to advertise for bids containing proposals to furnish this water supply.   There are no averments of fraud in the complaint, or other breach of duty than the one specified.   The only question before the court has reference solely to the illegality of the proposed contract.   Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263.   The averment that the price to be paid for the water, under the contract, is excessive, does not have the effect of charging that payment of such price is an illegal, wrongful, or fraudulent act upon the part of the commissioner or the board of public improvements.   Ziegler v. Chapin, 126 N. Y. 342, 27 N. E. 471.   It may be assumed that it is the scheme of the Greater New York Charter to require that contracts which have for their object the furnishing of supplies to the city in its various departments, which involve an expenditure exceeding $1,000, shall be founded upon sealed bids or proposals, received in pursuance of a public notice, duly advertised. It is also recognized in the charter that there are exceptions to this rule.   Consequently, it may be said that the exception to such rule, either by the express provision of the charter or by judicial construction in reaching the intent conveyed by its language, is equally the scheme of the charter.   We have, therefore, to consider whether the proposed contract and its subject-matter is of a character which subjects it to the provisions of the charter requiring advertisement and sealed proposals before it may be executed, or whether it falls within the excepted class.

It may be conceded that in a broad etymological sense the word "supply" embraces anything which may be furnished to meet the need of any particular department of the city or its inhabitants. And yet it is manifest that the use of such word in public charters was not intended to be construed in terms as broad as its etymological sense, and has been many times made to yield to incompatible conditions.   Indeed, its enforcement at all times would fail in accomplishment of the purpose for which it was created. Quite a considerable number of cases have arisen where the rule

has been held inapplicable, and the exception has been enforced. The purchase of fireworks was held to be an exception (Detwiller v. Mayor, etc., 46 How. Prac. 218), for the reason that such articles were of a peculiar character, depending upon the skill of the manufacturer. Contracts for furnishing coaches used by members of the common council in the discharge of their official duties were held to be excepted, for the reason that such contracts, from their very nature, were not intended to be embraced within a regulation requiring public advertisement and sealed proposals. Smith v. Mayor, etc., 21 How. Prac. 1.

In People v. Flagg, 17 N. Y. 584, it was observed by Judge Comstock:

"It would be an unreasonable and mischievous construction of the statute to apply it to services which require in their proper performance scientific knowledge or professional skill."

The particular phrase under consideration in that case was, "all work to be done and supplies to be furnished." The character of the service therein was making a survey and furnishing a map of the wharves and piers of New York City. While the question was not determined in that case, yet the language of Judge Comstock has received uniform confirmation since.

In Farmers' Loan & Trust Co. v. Mayor, etc., of City of New York, 4 Bosw. 80, the prohibition was held not to apply to a contract for the use of a pier for the removal of offal. It was suggested in that case that "supply" was used in a commercial sense, "relating merely to personal property, going into or forming part of something else or contributed for the use of something else, or towards its efficiency. The maritime doctrine as to supplies for ships, the state statutes in aid of material men, are instances of this nature. * * * It is in this sense that the phrase is used in various enactments connected with the government of New York."

People v. Van Nort, 64 Barb. 205, was mandamus to compel payment for water meters furnished without public notice and previous proposals. The court held it fell within the exception, using this language:

"The object of the provision in the charter is to secure the advantages of competitive offers for the work to be done, or the supplies to be furnished; and when the supply, as in this case, is one involving scientific results attained by mental and corporeal labor, the advantage cannot spring out of mere bids, but of tests to which the thing offered shall be subjected."

In this case it appeared that there were other meters upon the market, and that other people could furnish them. When the meter was finally selected, of course but one person could furnish it, as but one person had it to furnish. But the determination of what meter should be furnished was necessarily left to the discretion of the person charged with such duty, and manifestly rested upon considerations of judgment, knowledge, test, and the practical utility of the instrument desired; and for this purpose bids availed nothing. The same rule was also applied in Baird v. Mayor, etc., 96 N. Y. 567, 582. The rule of the above cases may

be found amplified in Harlem Gaslight Co. v. Mayor, etc., of City of New York, 33 N. Y. 309, where Judge Brown, in a learned opinion, said:

"Whenever the nature of the service or of the property needed for the public uses, or the time within which it must be had to prevent irreparable mischief under competitive offers is impossible, then the provisions of the acts referred to cannot apply, because such could not have been the intention of the lawmakers, and such emergencies were not amongst the mischiefs which the provisions referred to were designed to correct. The city needs lands in a particular locality for a public market, an engine house, or other public building. It requires professional services, those of an engineer, a physician, a lawyer, or an artist; or it may require services of any kind, and property to be furnished upon a sudden and unforeseen emergency, of greater value than the $250. If these things can only be obtained through the forms prescribed by the statutes, they cannot be obtained at all, for these things cannot become the subject of a competitive offer to be consummated by a written contract with the person making the most favorable offer. To this effect are the remarks of Judge Comstock upon the sections of the statutes referred to in the case of People v. Flagg, 17 N. Y. 584, and seem to me to be marked by reason and sound sense, and commend themselves as expressing the true construction of the legislative intention."

Other cases hold a similar doctrine. In re Dugro, 50 N. Y. 513; City of Hartford v. Hartford Electric Light Co., 65 Conn. 324, 32 Atl. 925. It is therefore evident that the question which we have before us is not a new question, and the provisions of the charter formulate no other or different rule than such as existed in former charters. The general rule, which seems now to have been pretty firmly settled, regarding the construction of this language, is that, where the subject-matter of the contract is such that competitive proposals work an incongruity, and are unavailing as affecting the final result, or where they do not produce any advantage, but the nature of the supply requires that it be determined from inspection and test, which are made up from present examination and trial, and depend upon special knowledge and judgment, or where the thing to be obtained is a monopoly, or the requirement is of personal skill or professional service, or it is practically impossible to obtain what is required, and observe such form, the language of the statute does not apply, and the particular case falls within the exception.

Having in mind these rules, let us proceed to an examination of the provisions of the charter, and find, if we may, into which class this contract falls. We feel quite safe in saying that a contract for a water supply is not such a supply as is generally understood in commercial language, and means something entirely different from a contract for the purchase and supply of nails, or a similar commercial commodity. The furnishing of water for a municipality is dependent upon many contingencies, such as its presence in a sufficient visible quantity for the purpose, the certain existence of its source of supply, and the purity of that source, without which it is worthless. It is quite evident that, if there was but one company which could furnish the supply, abundance of authority establishes that it would not be so embraced. The duty devolved upon the commissioner requires examination of all sources of supply; and I should be disposed to hold, if there were no other con-

siderations, that there is such an incongruity in competing for such a supply, and that the determination, involving as it does quality, quantity, and source, rests so largely upon special knowledge and skill in determination, as to remove it from the general provision of the charter, and place it within the exception, within the authority of the cases heretofore cited. In this respect the case most nearly resembles contracts for furnishing gas for lighting, and therefore falls within the decision of Harlem Gaslight Co. v. Mayor, etc., of City of New York, supra. Modern invention and improvement have mastered in large measure the question of lighting, with the result that competition in public lighting is quite as sharp and feasible now as in any other branch of business. This condition led the framers of the charter, by section 587, to specially provide for competitive bidding in respect of such contracts. We do not deny but that such conditions may hereafter exist as will bring the same competition and condition in the ability to supply water. It is, however, quite clear that such is not the existing condition at the present time, and the fact that special provision was made in the charter for lighting contracts, and none as to water contracts, is a suggestive circumstance that such provisions were not intended to apply thereto; and, in view of the affirmative provisions of the charter, which we shall presently consider, as well as its omission to make special provision for emergencies in connection with the water department, tends strongly to lead the mind to the conclusion that the true construction of the charter excepts such contracts. It is not, however, necessary that we should determine whether it is feasible to apply competitive bidding to the supply of water. Other considerations control the case. We think that section 419 of the charter has no application to contracts for furnishing water to the municipality of New York. Section 410 of chapter 10 of the charter creates the board of public improvements, and defines its membership. Other sections define its powers. By section 415, subd. 7, the board, among other things, is given power over "water rents, superintendence of water supply of private water companies, contracts for water supply with private companies or other municipalities." By section 419 it is provided that "all contracts to be made or let for work to be done or supplies to be furnished, except as in this act otherwise provided, * * * shall be founded on sealed bids or proposals," after public notice. The provisions of the charter relating to the water supply are found in title 4 of chapter 10, under the head of "Department of Water Supply." By section 468 of that title the head of the department is created, called the "Commissioner of Water Supply." Section 469, subd. 2, gives such commissioner control "of maintaining the quality of the water supply, and of the investigation for, and the construction of all work necessary to deliver the proper and required quantity of water with ample reserve for contingencies and future demands." By section 471 such commissioner is prohibited from entering into any contract with any person or corporation for supplying or selling water for public or private use, unless, preliminary to the execution of the contract, the same

be submitted to and have the assent of the board of public improvements; and the act itself is made the exclusive rule for the making of such contracts. By section 472, "the commissioner of water supply, with the approval of the board of public improvements, shall have power throughout the state of New York to select and to determine all sources of water supply that may be needed for the supply of the public waterworks of said city, and for the supply and distribution of water in said city." The power thus conferred is very broad. It gives the power to select and determine all sources of water supply that may be needed, subject to the approval of the board of public improvements. The imposition of such duty, and the power conferred in its exercise, are inconsistent with the view that such power and duty may be limited and circumscribed by a form of procedure which may not enable the commissioner to fulfill the obligation thus imposed. If he must only contract with the person who offers sealed proposals in pursuance of public notice, then he is deprived of the power of selection and determination, or may be, and the power conferred may thereby be defeated. This section goes much further, and makes any source of water selected by the commissioner, subject to the approval of the board of public works, the board of estimate and apportionment, and of the municipal assembly, the subject of proceedings in invitum, which may be exercised upon all persons and water corporations, subject to certain specified exceptions, not now important. Such commissioner is further authorized by this section "to examine into the sources of water supply of any private companies supplying the city of New York or any portion thereof or its inhabitants with water, to see that the same is wholesome and the supply is adequate, and to establish such rules and regulations in respect thereof as are reasonable and necessary for the convenience of the public and the citizens." By section 507 the commissioner is authorized, subject to the approval of the board of public improvements, to enter into contracts for the purchase of land for water purposes. Section 517 devolves upon the commissioner all the rights, powers, privileges, duties, and obligations theretofore existing by law or otherwise, to be by him exercised pursuant to the provisions and limitations of the act. By section 483 the commissioner is empowered to carry out the provisions of the act for the purpose of maintaining, preserving, and increasing the supply of pure and wholesome water for the use of the city, and for the purpose of preventing or removing contamination or pollution of any supply or source or sources of supply of water heretofore acquired by the city.

It is quite evident from a reading of these sections that it is the intent of the statute to confer upon the commissioner power to superintend the supply of water, supervise not alone the source of public supply, but the source of private supply, to the end that the water furnished may be adequate for the need, and pure and wholesome in quality. Such power is wholly at variance with the claim that it must be exercised in subordination to the right of any private company. All are under the supervision of the com-

missioner, and to enable him to properly discharge his functions much is and must be left to his judgment and discretion  Indeed, the construction which contends that he must not contract except notice be given and bids be received, may defeat the very end which the act seeks to accomplish.  It is for him to determine, in the first instance, whether the source of supply is pure and wholesome.  Competition in no wise determines this question.  The reason which commits authority to test various meters to see which is best, and, when the fact is determined, authorizes a contract without competition, is the same which empowers the commissioner to determine that a supply of water is wholesome, and then confers authority to contract for the supply, subject to the approval of the board.  In this connection it is noticeable that the authority conferred upon the board of public improvements by section 415, subd. 7, is the same in respect of contracts made with municipalities as with private companies.  It cannot be pretended that competitive bidding is applicable where the contract is made with another municipality, and yet there is the same provision of law with respect to each.  In addition to this it may be observed that by the provisions of section 419 the head of a department is authorized to enter into a contract where the same is founded upon competitive bidding, without referring the same to the board of public improvements for their approval.  It is only where the lowest bid is rejected that the matter becomes the subject of reference to the board, and the board may not then reject and award to another bidder unless by a vote of a majority of the board, of which majority the mayor and comptroller must form a part.  It is therefore evident that the rule of this section is to award contracts to the lowest bidder, and the departure from such rule furnishes the exception.  In respect of water contracts, the commissioner of water supply is given no power to enter into a contract until it has been submitted to the board of public improvements. On the contrary, as we have seen, by section 471, the preliminary requisite is that the commissioner shall, before executing a proposed contract, submit the same to the board in all its details, and the assent of the board to its execution shall be given by resolution.  This action is to be taken by the board, and undoubtedly requires a majority vote.  But such majority is not required to be made up by the votes of the mayor and comptroller, as is the case with competitive bidding.  In the first case the contract is not required to be submitted to the board, but is based upon the bid, and executed by the commissioner; in the second case the contract in all its details must be submitted to the board, and authorized by it, before it can be executed.  In the one case the authority to contract is the bid; in the other it is the proposed contract and the act of the board.  The difference seems to be radical, and to indicate two essentially different schemes for the execution of contracts.  The very reason why the contract was required to be submitted to the board for approval would seem to be the inapplicability of competitive bidding for such contracts.

We need not, however, be limited to this assignment of reason.

The clause of the charter requiring competitive bids for supplies furnished has been found in the charters of New York City for over 40 years, and under none of them has it ever been held or supposed that it embraced a supply of water for municipal use. The present charter upon this subject is a revision or codification of former statutes, and in none of them was it required that such contract should be the subject of competitive bidding. Laws 1883, c. 512; Laws 1884, c. 292; Transportation Corporation Law (Laws 1892, c. 617, § 81). Laws 1882, c. 410, § 351, authorized the city to contract with the city of Yonkers for a water supply. These statutes, so far as they affect the Greater New York Charter, have been repealed, and the charter provisions substituted therefor. It is a well-settled rule of judicial construction that the revision of a statute does not change the law, even though there be a change in phraseology, unless such change clearly indicates an intention to enforce a different rule. Davis v. Davis, 75 N. Y. 221. It is quite evident that there is nothing in the phraseology or in the method of revision in the New York charter which indicates an intent to establish a different rule from that which had previously existed; and this is true both as to the provisions which require competitive bids before contracting and those which authorize an execution of the contract without it. This is further evidenced by the fact that, while the consolidation act, so called (Laws 1882, c. 410, § 351), is repealed, the provision in substance is found in section 474 of the charter. There is no more reason for holding that a change was intended by reason of the present provision contained in the charter than there was that the rule of competitive bidding should have been made applicable at the time when the previous statutes were passed. On the contrary, as we have seen, the large powers which are invested in the commissioner of water supply seem to be clearly inconsistent with the provision which requires competitive bidding before a contract can be executed.

This view finds still further support from a consideration of the fact that by sections 618, 675, 704, relating to the departments of correction, parks, and public charities, is found provision authorizing, in case of an emergency, the purchase of articles immediately required, without calling for competitive bids, while there exists no corresponding provision applicable to the department of water supply. It is clear that conditions may arise requiring the immediate use of water beyond the present supply. Indeed, the use of water is nearly as requisite to the well-being of the inhabitants as the use of air; so that the supply is always in immediate demand; and any contingency which would deprive the inhabitants of the usual source of supply would create an emergency as great as it is possible to have at any time in any department of the city government. The fact, therefore, that such emergency was not provided for is a strong and pertinent circumstance in favor of the view that the framers of the charter did not intend to make section 419 applicable to contracts which should be executed in the department of water supply. We therefore reach the conclusion, from a consideration of the charter as a whole, that the purpose

which it seeks to accomplish does not embrace, within the section which requires competitive bidding, contracts having reference to the supply of water to the municipality. So far as circumstances which involve the policy of the municipality in respect of whether it shall contract for water to be supplied by private companies or shall adopt the policy of municipal ownership are concerned, it cannot affect the question with which we are now dealing. Such considerations are outside the powers and duties devolved upon the courts. What the water policy of the municipality shall be has not been committed to their judgment, discretion, or consideration; but in the distribution of the powers of municipal government such determination has, by the present charter, been committed to the officers of the municipal government; and, whatever may be the private judgment of the courts with respect to the policy which ought to be pursued by the municipality, it nevertheless finds no place for the exercise of any of the powers which have been confided to it, and the policy may not, therefore, be properly considered. If the legislature desires to devolve such powers upon the court, it perhaps has the power so to do. If the legislature desires to make the supply of water the subject of competition, it also has the power so to do; but until it shall have so legislated the courts are powerless to command a different rule. We reach the conclusion that the legislature has not yet so expressed itself, in consequence of which the commissioner of water supply and the board of public improvements have power to authorize and make a contract similar to the one now before us.

Upon the oral argument it was pointed out that the present contract needed correction, for the protection of the city, in respect of the option clause and the amount of water to be furnished. As such provision was stated to be the result of misapprehension, and would be corrected, the case needs no further discussion at our hands.

The order should be reversed, and the motion to continue the injunction should be denied, with $10 costs and disbursements.

All concur, except GOODRICH, P. J., dissenting.

GOODRICH, P. J. (dissenting). I am unable to concur with the views of my associates in this action, and feel called upon to state my reasons. This is a taxpayer's action, brought by the plaintiff, a citizen and resident of the borough of Queens, for the purpose of restraining certain official acts which are alleged to be illegal, and the waste of public funds. An injunction order was made by one of the justices of this court, forbidding the defendant Dalton, as commissioner of water supply, to make any contract in behalf of the city with the defendant corporation the Citizens' Water-Supply Company of Newtown for the supply of water to said city, within the borough of Queens, to be used by the city, unless, prior to the making of such contract, proposals for the supply of such water had been invited by public advertisement, pursuant to section 419 of the Greater New York charter (Laws 1897, c. 378), and requiring the defendants to show cause why such in-

junction should not continue during the pendency of the action. On the argument of this motion the injunction was so continued, and from this order the defendants appeal.

The complaint alleges that the Citizens' Supply Company is a domestic corporation organized under the transportation corporations law (Laws 1890, c. 566), and that on February 16, 1898, an application was made to the board of public improvement of the city of New York for the approval of a proposed contract between the city of New York and the defendant corporation for the supply of water to the city of New York, and the authorizing of the defendant Dalton to execute said contract in behalf of the city, although the charter forbade the making of any such contract without public advertisement for proposals and bids for the work; that the price proposed was excessive; that, if bids were advertised for, a bid would be made by the Woodside Water Company at a lower rate than that named by the defendant company in the proposed contract; that the supply could be obtained at a much lower rate than that named in the contract; and that the making of said contract without advertisement for bids is illegal, and would result in waste and injury to the property and funds of the city. The defendant Dalton answered, and presented affidavits denying the equities of the complaint; and while, under ordinary circumstances, this would prevent the issuing of an injunction pendente lite in an action between individuals, I do not think the rule necessarily controls in a case of the character of the action at bar. No advertisement was made, and for the purpose of the argument the defendant company concedes that the board of public improvement proposes to approve a contract of the same general nature as such proposed contract. The proposed contract of the defendant company provided for the purchase of water to be supplied to the mains of the town of Newtown to the extent of at least 500,000 gallons of water per day, the amount to be increased to 3,000,000 gallons, when required by the city, all at the rate of $65 per million gallons, the contract to continue for three years, with the option to the city to purchase at a valuation to be determined according to the provisions of the charter. The principal question involved is whether a contract for a supply of water can be executed without opportunity for public competitive bids, and this requires a somewhat extended statement of the provisions of the act known as the "Greater New York Charter" (Laws 1897, c. 378). Section 410 establishes the board of public improvements, which consists of the mayor, president of the board, and eight heads of departments, including the commissioner of water supply and the borough presidents. Section 415, among other things, confers upon the board power over "superintendence of water supply of private water companies, contracts for water supply with private companies." Section 416 authorizes the board of public improvements to prepare and recommend to the municipal assembly all ordinances and resolutions regulating "contracts for public work or supplies, and agreements in relation thereto by which the city shall be liable to pay money; and such ordinances, among oth-

er matters, must provide that the award, if any, must be made to the lowest bidder, unless the board of public improvements, by the vote of a majority of its members, of whom the mayor and the comptroller shall be two, shall determine that it is for the public interest that a bid other than the lowest should be accepted, and that no contract shall be made until the comptroller certifies thereon that the necessary funds are provided and applicable thereto." Section 419 provides that:

"All contracts to be made or let for work to be done or supplies to be furnished  *  *  *  shall be made by the appropriate heads of departments under such regulations as shall be established by ordinance or resolution of the municipal assembly. Whenever any work is necessary to be done to complete or perfect a particular job, or any supply is needful for any particular purpose, which work and job is to be undertaken or supply furnished for the city of New York, and the several parts of the said work or supply shall, together, involve the expenditure of more than one thousand dollars, the same shall be by contract, *  *  *  and all contracts shall be entered into  *  *  *  and shall  *  *  * be founded on sealed bids or proposals, made in compliance with public notice, duly advertised."

Section 468 provides for the appointment of a "commissioner of water supply." Section 471 reads as follows:

"It shall not be lawful for the commissioner of water supply to enter into any contract whatever with any person or corporation engaged in the business of supplying or selling water for private or public use and consumption, unless, preliminary to the execution of the contract, the assent of the board of public improvements, after submission to it of the proposed contract in all its details, shall be given by resolution to the execution of such contract as submitted, and it shall not be lawful for the said city of New York or for any department thereof, to make any contract touching or concerning the public water supply, and especially the increase thereof, with any person or corporation whatsoever, save in accordance with the provisions and requirements of this act, which said provisions and requirements are hereby declared to establish the exclusive rule for the making of such contracts."

Section 472:  "*  *  *  The commissioner of water supply is hereby authorized to examine into the sources of water supply of any private companies supplying the city of New York or any portion thereof or its inhabitants with water, to see that the same is wholesome and the supply is adequate, and to establish such rules and regulations in respect thereof as are reasonable and necessary for the convenience of the public and the citizens."

The general scheme of the charter is that all supplies are to be contracted for only upon the initiative of the board of public improvements, and after an ordinance or resolution of the municipal assembly, and then only after public advertisement for proposals, and opportunity given for competition. The only exception, so far as supplies are concerned, appears by section 419 to be those cases where it is otherwise ordered by a vote of three-fourths of the municipal assembly. There is also the provision that a contract need not be awarded to the lowest bidder where the board of public improvements, by a vote of a majority of its members, of which the mayor and comptroller shall be two, shall determine that it is for the public interest that a bid other than the lowest shall be accepted. This would seem specifically to provide for a case where there is anything unusual in the character of the supplies to be furnished, or where some emergency arises, and, taken in connection with the provision that the commissioner of water supply is

empowered to examine the character of water and sources of water supply, would appear to be exactly adapted to the situation involved in the case at bar. Section 419 is substantially the same as section 64 of the New York City consolidation act (Laws 1882, c. 410); and section 1608 of the Greater New York charter provides that, where its own provisions are the same in terms or in substance and effect as the provisions of the said consolidation act, the charter is intended to· be, not a new enactment, but a continuation of the consolidation act of 1882, and shall accordingly be so construed and applied. The abuses which have blackened the histories of cities in modern times have occasioned the introduction into nearly all the municipal charters of our country of the requirement that work to be done and supplies to be furnished should be subjected to competition, and the contract awarded to the lowest bidder. The Greater New York charter, so far from being exceptional on this point, is replete with the requirement. Laws 1897, c. 378, § 416, subd. 13, and §§ 419, 541, 562, 587, 618, 675, 704, 1076, 1077, 1528. The appellants, I think, mistake the only exception it contains. The board of public improvements cannot, in the first instance, relieve the commissioner of supplies. In all cases a resolution of authority must emanate from that board, and receive the sanction of the municipal assembly; but this authority, if to purchase, must follow the regular method, and call for competitive bidding. After bidding has been had, and a contract is proposed, then, but not till then, can the board of public improvements—the mayor and comptroller participating—relieve the commissioner of water supply from the binding obligation to make the contract with the lowest bidder.

In Harlem Gas Co. v. Mayor, etc., of City of New York, 33 N. Y. 309, 329, the court said:

"The purpose of the statutes is to insure economy in the public administration, and honesty, fidelity, and good morality in the administrative officers. Competitive offers or bids have no other object but to insure economy and exclude favoritism and corruption in the furnishing of labor, services, property, and materials for the uses of the city."

If, by any limitation of definition, water is not included in the word "supplies," it certainly cannot be excluded from the words "property and materials," as used in the above citation. The familiar principle of statutory construction that all the provisions of a statute must be taken into consideration in deriving its meaning, needs no citation of authority. It is said in Beekman v. Railroad Co., 153 N. Y. 144, 160, 47 N. E. 277, 282:

"It is a statute conferring power upon local authorities and regulating the procedure for the disposition of public franchises; and, even if open to two constructions, that must be preferred which best safeguards the public interests, conduces to the harmonious operation of all its parts, and promotes purity and simplicity of administration."

It is contended, however, that an exception is made by the charter in reference to a supply of water; that water is not within the purview of "supplies" as named in section 419; and that it must be shown that a supply of the quantity and quality can be fur-

nished by two or more persons, and at the time required. This contention finds an apparent sanction in the three cases: Harlem Gas Co. v. Mayor, etc., of City of New York, supra, In re Dugro, 50 N. Y. 513, and Baird v. Mayor, etc., 96 N. Y. 567. The last two cases related to patented articles, and, in my opinion, do not control the question. One of these cases related to a patented pavement, known as the "Nicholson," and the other to Navarro's patent water meters. There could be no competition in these articles, and the court held that the provisions of the old charter, which required competitive bidding, could not be held applicable to such a case.

I do not contend that, where bids can avail nothing, it would be necessary to advertise for competitive bids. Such a construction would be absurd; and this was the ground of the decision in Baird v. Mayor, etc., supra, cited by Mr. Justice HATCH. This case related to the patented Navarro water meters, and the court, at page 582, 96 N. Y., said:

"Under such circumstances it has been frequently held that provisions of law requiring contracts on behalf of a municipal corporation to be let to the lowest bidder are not obligatory upon its officers on account of their inherent inapplicability to the nature and circumstances of the case. If a desired article can be obtained from one person alone, it would be not only a farcical, but also a hazardous, proceeding to subject the city to the obligation of making a contract at the lowest price offered, when there was but one person who could lawfully bid for the privilege of sale. Such a construction might compel a contract for a price dependent upon the arbitrary will and caprice of one only of its parties. The object and design of the restriction is wholly inappropriate to the circumstances attending this contract, and can be made to apply to it only by disregarding its plain purpose and intent. Similar provisions have heretofore uniformly been held to be inapplicable to contracts of the character in question."

In Re Merriam, 84 N. Y. 596, 601, Miller, J., referring to a provision "that supplies and work shall be furnished by contract, that no contract shall be made until proposals are advertised for," used this significant language:

"The statute, and ordinance passed in pursuance of the same, were intended to establish a system by which work done for and supplies furnished to the city should be the subject of competition, and allotted to the lowest bidder for the same; and a substantial compliance with these requirements is essential to carry into effect the object of these regulations, which evidently were adopted to prevent a wasteful expenditure of the public money, and to promote economy as well as practical convenience in the administration of the financial affairs of the city."

In the case at bar the record shows clearly that other persons are prepared to bid and to furnish water from the underlying water supply of Long Island. The Harlem Gas Case related to gas to be furnished by a gas corporation which had a part of its mains and pipes already laid, and an apparent monopoly of the business; but in the present charter it is specifically provided that even gas can be contracted for only after competitive bids have been sought, so that the intention of the charter is superior in effect to this decision of the court of appeals, which related to a former charter provision. The word "supplies" mentioned in section 419 is a generic term, which, in common speech, is applicable to all

articles furnished to a municipality. It is a familiar principle that resort may be had to other sections of a statute to ascertain the meaning in which particular words are used. The word "supply" appears in the actual title of the commissioner of water supply. The word "supplies" also appears in the title of the commissioner of public buildings, lighting, and supplies. The latter department has charge of the gas supply of the city, and the gas supply can be contracted for only after competitive bids. This seems to me to create a very strong inference, as it was enacted after the decision of the Harlem Gas Case, that, if the supply of gas can be had only after competitive bids, water comes within a similar requirement. The words "supply of water," or "water supply," or "supplying water" appear in almost every section of the title which creates and defines the duties of the commissioner of water supply, except those which relate to proceedings for condemnation of land.

I should have hesitated to resort to admiralty law as a guide for the definition of the term "supplies," except that in his opinion Mr. Justice HATCH cites the case of Farmers' Loan & Trust Co. v. Mayor, etc., of City of New York, 4 Bosw. 80, where the court speaks of the maritime use of the word "supplies," and cites cases from the admiralty courts in support of its opinion. It can hardly be disputed that water furnished to a steamer or other vessel would come under the term "supplies" in any action brought against the vessel or her owners for the value of the water thus furnished. Under the Greater New York charter, water is an article of merchandise, as it had been under the charter of former New York. It is sold and delivered for a price stated. Section 475 authorizes the use of water meters to measure water "supplied" to buildings, and section 575 contains provisions respecting gas meters, to be used to measure the gas furnished either to the city or its citizens. Water is just as much a supply as gas, and competitive bids must be had for the latter in all cases. The exhaustive opinion in Hennessey v. Volkening, 30 Abb. N. C. 100, 22 N. Y. Supp. 528, was for many years the standard authority on this subject, and clearly establishes the point stated. Says the court, at page 105, 30 Abb. N. C., and at page 531, 22 N. Y. Supp.:

"As regards water rents, the city occupies the position of a merchant with commodities for sale. It collects a quantity of water, provides means for its distribution, fixes a rate at which it will supply with water, and proclaims that all requiring water can have it at that rate. The city does for water what the gas companies do for gas."

The court points out that the rent or charge for water is not a tax or assessment, but an indebtedness as for goods sold and delivered; enforceable, like a mechanic's lien, upon real property. It is plain to see, under this authority, that water purchased of the city, from a legal standpoint, comes under the charter term "supplies." I cannot see why water purchased by the city does not fall within the same category, and believe that my view of the plan of the charter, as to water supply, is strongly reinforced by a consideration of what is generally supposed to be the subterranean

water supply on Long Island, from which much of the water as at present used by the city is derived. It is believed by eminent professional engineers that a body of fresh water permeates the entire land below the lines of the tides; and it is now yielding to the borough of Brooklyn alone from thirty to forty million gallons a day, without giving any signs of diminution. Under pump-well inventions it is only necessary to drive a gang of small pipes a short distance into the earth to extract by a single engine several million gallons a day from this subterranean reservoir. That water thus furnished to and purchased by the city in vast quantities is a "supply," as a matter of fact, is quite evident, and it is a supply to which, in the largest and most effective sense, the competitive system provided by the charter ought, in the interest of good government, to be applied by the rulings of our courts.

I do not see that there is any practical difficulty in respect to bids for water. The record discloses that there are at least two other companies which are prepared to propose bids, and it cannot be assumed, for the purposes of this appeal, that they are any less competent to carry out their proposals than the defendant corporation. The charter provides that a deposit of money must accompany a bid, and that when a bid is accepted a bond must be given for the fulfillment of such contracts. Section 420. This affords protection to the city against incompetent bidders. Nor can it easily be seen that, if a bid is accepted from some other than the defendant corporation, the scrutiny of the board of public improvement required by section 471 will be obviated. The proposed contract of a successful bidder must pass the scrutiny of that board, just the same as the proposed contract of the defendant corporation. The question of the ability of the Woodside or Jamaica Water Companies, or any other company to be formed, or of private individuals, to furnish pure and wholesome water, is one of the subjects within the power of the department of public improvements to consider; and if it should conclude that such companies or persons were not capable of fulfilling their proposals, either in quantity or quality, or with celerity, such bid could be rejected under section 419, which gives authority to the board to reject all bids where it is deemed for the interest of the city so to do, or by a certain vote to award it to a person other than the lowest bidder; but this should be done only after all persons interested have had opportunity for competition. I do not lose sight of the necessity for an early supply of water to the borough of Queens, which is set forth in the record. But the case can be tried at an early day, and a condition to that end might be made in the order upon this appeal.

The defendants' counsel contend that the affidavits used upon the motion show very clearly that no other company except the defendant corporation is in a position to supply a sufficient quantity of pure and wholesome water; that the present supply of the town is wholly inadequate, and that there is immediate necessity for a supply of 5,000,000 gallons per day; that the price proposed is much less than the rate at which the city secures water in its own

plant. All these questions can be decided on the trial of the action in a manner much better calculated to safeguard the interests of the city than can be done on a motion for an injunction. The issues are already framed by the service of an answer, and an early trial can be had.

I do not think it needful to add anything upon the question of "spoliation," so clearly set out in the opinion of the learned justice at special term, but I venture to say that there is sometimes a possible danger that those who stand ready to enter into lucrative and profitable contracts with the municipality may take advantage of the necessity, cry for an additional water supply, and use it as a means of assisting in the addition of a new burden to the already strained resources of the city, and of hurrying public officials into making an illegal contract, and then asking the courts to sanction its enforcement on the ground of a great public emergency. I can see no detriment to the public interest in pursuing the plain requirement of section 419 of the charter that all contracts for supplies shall be made only after opportunity for public competition.

It is to be observed that the injunction order does not absolutely restrain the making of a contract, but merely the making it without 10 days' previous advertisement for bids; and, if this course should be taken, there will be only a short delay in furnishing water to the public, so that there can be little detriment to the public service. Indeed, if the situation evoked by the injunction order of the 18th of March had been promptly accepted by the defendants, the 10-days advertisement might have been already completed, and the parties would have been in a condition to enter into a suitable contract without further delay.

These considerations bring me to the conviction that the injunction order should be continued during the pendency of the action, and that the order of the special term should be affirmed.